```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
ALLEN BELL a/k/a ALLEN WALKER,

              Plaintiff,                    MEMORANDUM AND ORDER

          - against –                        19 Civ. 5868 (NRB)

CITY OF NEW YORK, individually
and in their official as New
York City police officers
JACLYN RODNEY, HELIN MARTE and
JOHN or JANE DOE 1-10,

              Defendants.

------------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Allen Bell ("Bell") brings this action pursuant to 42 U.S.C. § 1983 against the City of New York ("City"), New York City Police Department ("NYPD") officers Jaclyn Rodney ("Rodney"), Helin Marte ("Marte"), and John and/or Jane Doe NYPD officers (collectively, "defendants").  Bell has asserted federal claims against the City for municipal liability pursuant to Monell v. Dep't of Social Services of City of New York, 436 U.S. 658 (1978), and against the individual defendants for false arrest and false imprisonment, excessive force, malicious prosecution, failure to intervene, and malicious abuse of process.  Bell also asserts state law claims for false arrest and false imprisonment, assault and battery, malicious prosecution, failure to intervene, malicious abuse of process, and negligent hiring, retention and supervision.

Before the Court is defendants' motion for summary judgment. For the reasons set forth below, the Court grants defendants' motion and dismisses the complaint in its entirety.

## BACKGROUND[1]

### I.   1760 Lexington Avenue

This case arises from two arrests that occurred on February 10, 2018 and February 23, 2018 at 1760 Lexington Avenue in New York City.  1760 Lexington Avenue is a New York City Housing Authority ("NYCHA") building.  See 56.1 ¶ 5.  As a NYCHA building, 1760 Lexington Avenue's premises are exclusively for the use of residents, invited guests, and persons with legitimate business. Id. ¶ 8.  "No Trespassing" and "No Loitering" signs are posted in the lobby of the building and were present on February 10, 2018 and February 23, 2018.  Id. ¶ 9.

At the relevant time, Officers Rodney and Marte were both

---

[1]     The following facts are drawn from the Rule 56.1 statement submitted by defendants on April 2, 2021 (ECF No. 46) and Bell's responses and objections filed on May 24, 2021 (ECF No. 55) (collectively "56.1"), and the exhibits submitted contemporaneously with defendant's motion for summary judgment and appended to the declaration of Laura Iheanachor (ECF No. 45).  The facts are undisputed unless otherwise noted.

We note that Bell submitted an affidavit from Nirma Amador on May 24, 2021, appended to the declaration of Sang J. Sim (ECF No. 54), which defendants contend should be disregarded based on Bell's failure to disclose Amador pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i).  See Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Reply") (ECF No. 58) at 2-4.  Given that this affidavit does not relate to either of Bell's interactions with the NYPD officers and thus does not impact our analysis below, we need not address defendants' arguments on this issue.

assigned to Police Service Area 5 as Neighborhood Coordination Officers whose duties included addressing NYCHA resident concerns, such as noise complaints and drug concerns, as well as conducting patrols of NYCHA buildings.  Id. ¶¶ 1-4.  Prior to February 10, 2018, there had been increased complaints made by building residents of trespassing, drug use, gambling, public consumption of alcohol, and loud music in the lobby, which resulted in an increased police presence.  Id. ¶¶ 11-12.

## II.  February 10, 2018 Arrest

On February 10, 2018, Officers Rodney and Marte were conducting a routine patrol of 1760 Lexington Avenue when they noticed Bell in the lobby by himself.  Id. ¶¶ 14-16.  Bell, who was aware of the "No Trespassing" and "No Loitering" signs, was not a building resident and had been in the lobby of the building for approximately ten minutes prior to his interaction with the NYPD officers.  Id. ¶ 17.  After asking Bell whether he was a building resident, Bell responded that he was not, but that he was waiting for a friend.  Id. ¶¶ 18-19.[2]  The officers then instructed Bell that he could not loiter in the building.  Id. ¶¶ 22-23.  At

---

[2]    While it is stipulated that Bell was not a resident of 1760 Lexington Avenue and that he informed the officers of such on February 10, 2018, it is worthy of mention that Officer Rodney recounted interacting with Bell "a couple days before February 10th."  See Memorandum of Law in Support of Defendants' Motion for Summary Judgment (ECF No. 47) ("MSJ") Ex. D at 130:12-15.  According to Officer Rodney, Bell told her during this interaction that "he didn't live inside the location."  Id. at 140:15-141:4.

no point during his exchange with the NYPD officers in the lobby did the individual who Bell was allegedly visiting appear in the lobby, nor did Bell attempt to contact this person or provide their name or apartment number.  Id.  ¶¶ 20-21.  Bell was subsequently arrested for trespass.  Id. ¶¶ 22-23.

Bell was then transported to Police Service Area 5, where he was processed.  Id. ¶ 26.  At no point during his arrest did Bell complain about his handcuffs, and it is undisputed that he did not sustain any injury or request medical attention.  Id. ¶¶ 25, 27-29.

Following his arrest, Bell was arraigned in New York County Criminal Court on charges of Criminal Trespass in the Second Degree, Criminal Trespass in the Third Degree, and Trespass.  Id. ¶ 30; MSJ Ex. H.

### III. February 23, 2018 Arrest

On February 23, 2018, then-Captain Yakatally, patrolling outside of 1760 Lexington Avenue, observed four individuals, Bell, Mark Nurse ("Nurse"), Jesse Nowell ("Nowell"), and Jason Nesbitt ("Nesbitt"), through the front lobby window.  Id. ¶ 33, 38.  Nurse, Nowell, and Nesbitt, like Bell, were not residents of the building.  Id. ¶ 34.  According to Captain Yakatally, the individuals were "standing in a circle engaging in what appeared to be gambling

. . . repeatedly shaking their hands, throwing what appeared to be small objects onto the floor and picking up said objects." Id. ¶ 39. "[B]ased on his prior experience," Captain Yakatally "believed his observations of the individuals in the lobby of 1760 Lexington Avenue were consistent with gambling." Id. ¶ 40. Therefore, he instructed the command center at Police Service Area 5 to send officers to further investigate. Id. ¶ 41. These officers included Officers Rodney and Marte, as well as plain-clothes officers. Id. Two plain-clothes officers then entered the lobby of 1760 Lexington Avenue and detained Bell, Nurse, Nowell, and Nesbitt. Id. ¶ 42. Additional officers then entered the lobby, including Officers Rodney and Marte, who recognized Bell from the February 10 arrest. Id. ¶¶ 44-46. NYPD officers then conducted a search of all four men and recovered dice, which were subsequently vouchered.[3] Id. ¶ 48; MSJ Ex. L. At no point during his interaction with NYPD officers at 1760 Lexington Avenue did Bell provide the name or apartment number of any resident that he was visiting, nor did he attempt to contact any such person. Id. ¶ 47.

Bell, along with the other three men, was transported to

---

[3]    Although not mentioned in the 56.1 Statement, according to Officer Rodney, one of the other individuals arrested with Bell told her that "they were engaging in a game of chance with dice exchanging money." See MSJ Ex. D at 60:8-19.

Police Service Area 5, where they were all processed.  Id. ¶ 51.
Bell did not complain about his handcuffs being too tight, and it
is undisputed that he did not suffer physical injury or request
medical attention either at Police Service Area 5 or at central
booking.  Id. ¶¶ 50, 53-55.

Based on this arrest, Bell was arraigned on in New York County
Criminal Court on charges of Criminal Trespass in the Third Degree
and Loitering.  Id. ¶ 56; MSJ Ex. I.

## IV. Criminal Proceedings

On August 1, 2018, the two criminal prosecutions were
dismissed.  Id. ¶¶ 59-60.  The prosecution related to the February
10, 2018 arrest was dismissed based on speedy trial grounds, while
the prosecution related to the February 23, 2018 arrest was
dismissed on a motion from the New York County District Attorney's
Office.  Id.; MSJ Exs. J, K.

## V. Procedural Posture

On June 21, 2019, Bell filed the Complaint in this action,
naming Officers Marte and Rodney, the City of New York, and John
or Jane Doe officers as defendants.  See ECF No. 1.  Defendants
filed an answer on September 10, 2019, denying the allegations
contained in the Complaint.  See ECF No. 10.  The parties
subsequently engaged in discovery, which concluded on December 31,

2020.  See ECF No. 36.  Following the end of discovery, on April 2, 2021 defendants filed this Motion for Summary Judgment.  See ECF No. 44.

## STANDARD OF REVIEW

Summary judgment is properly granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material "when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion," as well as the basis for any absence of material fact in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

"[T]he party opposing summary judgment may not merely reason the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth

specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

**DISCUSSION**

**I.  Plaintiff's Claims Against the Individual Defendants**

*a. False Arrest*

In order to assert a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Bernard v. U.S., 25 F.3d 98, 102 (2d Cir. 1994). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks and citation omitted).

*b. Malicious Prosecution*

"To make out a federal claim [of malicious prosecution] under 42 U.S.C. 1983 in addition to a state-law claim, a plaintiff must

show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." Willey v. Kirkpatrick, 801 F.3d 51, 70 (2d Cir. 2015). "The elements of a claim for malicious prosecution in New York are: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Id.

### c. Failure to Intervene

"A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Jean-Laurent v. Wilkinson, 540 F. Supp.2d 501, 512 (S.D.N.Y. 2008). "Failure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim." Usavage v. Port Auth. Of New York & New Jersey, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) (internal quotation marks

and citation omitted); Williams v. City of New York, 409 F. Supp. 3d 137, 143 (E.D.N.Y. 2019) ("Because there was probable cause to arrest Williams, his claim for failure to intervene necessarily fails, as well.").

### d. Malicious Abuse of Process

"In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (quoting Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994)). "In addition, a plaintiff bringing an abuse of process claim must allege actual or special damages." Sforza v. City of New York, No. 07 Civ. 6122, 2009 WL 857496, at *16 (S.D.N.Y. Mar. 31, 2009). "Malicious abuse of criminal process also supports liability under § 1983." Savino, 331 F.3d at 76-77. "[W]hile the law is not entirely settled on this point, the weight of authority holds that the presence of probable cause negates a claim for abuse of criminal process." Pinter v. City of New York, 976 F. Supp. 2d 539, 569 (S.D.N.Y. 2013).

*e. Excessive Force*

"To establish a claim of excessive force, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, objectively unreasonable under Fourth Amendment standards." Davis v. Rodriguez, 364 F.3d 424, 431 (2d Cir. 2004). "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am. V. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004).

## II. Probable Cause

We address the issue of probable cause at the outset, given that it is either a necessary element or provides a complete defense for all of Bell's federal claims against the individual defendants other than his excessive force claim. "Probable cause is established when the arresting officer has knowledge or reasonable trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Harrison v. Cty. of Nassau, 804 F. App'x 24, 27 (2d Cir. 2020) (internal quotation marks and citation omitted). "When determining whether probable

-11-

cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted); Weyant, 101 F.3d at 852 ("The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to pertinent events and the knowledge of the officers . . . ").

Defendants maintain that probable cause existed to arrest Bell for both the February 10, 2018 and February 23, 2018 arrests. See MSJ at 7-11.

### a. February 10, 2018 Arrest

On February 10, 2018, Bell was arrested and charged with Trespass, Criminal Trespass in the Second Degree, and Criminal Trespass in the Third Degree. See 56.1 ¶ 23; MSJ Ex. H (ECF No. 45-8). "A person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises." N.Y. Penal Law § 140.05. "A personal is guilty of criminal trespass in the second degree when: (1) he or she knowingly enters and remains unlawfully in a dwelling," and "[a] person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property (a) which is fenced or otherwise

enclosed in a manner designed to exclude intruders
. . . or (e) where the building is used as a public housing project
in violation of conspicuously posted rules or regulations
governing entry and use thereof . . . " N.Y. Penal Law §§
140.10(a),(e), 140.15(1). "A person is licensed or privileged to
enter or remain on premises that are open to the public unless
that person defies a lawful order not to enter or remain on the
premises." McKay v. City of New York, 32 F. Supp. 3d 499, 506
(S.D.N.Y. 2014) (quoting N.Y. Penal Law § 140.00(5)).

"[O]fficers must have probable cause to believe that a person
does not have permission to be where she is before they arrest her
for trespass." Mitchell v. City of New York, 841 F.3d 72, 78 (2d
Cir. 2016) (quoting Davis v. City of New York, 902 F. Supp. 2d
405, 426 (S.D.N.Y. 2012)). Thus, "New York courts have required
officers to have reasonable grounds to believe that someone was
neither a resident nor an invited guest in order to have probable
cause to believe that he is trespassing." Greene v. Bryan, No. 15
Civ. 249, 2018 WL 3539811, at *11 (E.D.N.Y. July 23, 2018) (quoting
People v. Ruiz, No. 056832C-2006, 2007 WL 1428689, at *2 (N.Y.
Sup. Ct. 2007)). The New York Court of Appeals has "held that it
was sufficient to provide reasonable cause to believe [that a]
defendant committed trespass [when] he admitted he did not reside

at the building and could not identify a resident who had invited him onto the premises." Id. (quoting People v. Barnes, 26 N.Y.3d 986, 990 (N.Y. 2015) (emphasis in original).  Further, "New York courts have generally considered common areas of residential apartment buildings to be 'closed to the public' if they are behind locked doors or if they contain posted 'no trespassing' signs." McKay, 32 F. Supp. 3d at 507.

It is undisputed that 1760 Lexington Avenue "is a NYCHA residential apartment building owned and operated by the City of New York," and its premises "are for the exclusive use of residents, invited guests, and persons with legitimate business." See 56.1 ¶¶ 5,8.  Further, "No Trespassing" and "No Loitering" signs were posted in the lobby of the building, which Bell was aware of.  Id. ¶ 10.  Bell also does not dispute that he was not a resident of 1760 Lexington Avenue on February 10, 2018, and he was alone when he was observed by the NYPD officers.  Id. ¶¶ 13, 16.[4]  When confronted by Officers Marte and Rodney in the lobby, Bell admitted that he was not a resident of the building.  Id. ¶¶ 18, 19.  While Bell told the officers that he was visiting a friend, he did not provide the officers with the name or apartment

---

[4]     According to Officer Rodney, she was also aware of the fact that Bell was not a resident, as he had informed her "a couple days before February 10th." See MSJ Ex. D at 130:12-15.

number of the person who he was allegedly visiting, nor did he call or otherwise attempt to contact her.  Id. ¶¶ 19, 20.

Based on these facts, it is clear that Officers Marte and Rodney had probable cause to arrest Bell.  Bell argues that the fact that officers "never asked [him] question[s]" regarding the name and apartment number of the person that he was visiting negates probable cause.  See Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 53) ("Opp'n") at 9.  Bell provides no authority to support this position, nor can he.  The law is clear — the officers had no obligation to conduct a further investigation given that "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest."  Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997); Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003) (finding that once probable cause is established, an officer need not accept unsubstantiated assertions nor investigate them); Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before

arresting him.").

   b. February 23, 2018 Arrest

On February 23, 2018, Bell was arrested and charged with Criminal Trespass in the Third Degree and Loitering.  See MSJ Ex. I (ECF No. 45-9).  "A person is guilty of loitering when he loiters or remains in a public place for the purpose of gambling with cards, dice or other gambling paraphernalia . . . "  N.Y. Penal Law, § 240.35(2).  A "public place" for purposes of the New York criminal loitering statute includes "hallways, lobbies and other portions of apartment houses."  N.Y. Penal Law, § 240.00(1).

Just as on February 10, when Bell entered 1760 Lexington Avenue on February 23, 2018, he was not a resident of the building and was not accompanied by any resident.  See 56.1 ¶¶ 13, 34.  As with the events of February 10, the facts bear out that the officers had probable cause to arrest Bell on February 23, 2018.

On February 23, 2018, Captain Yakatally observed Bell and three other individuals (Jason Nesbitt, Mark Nurse, and Jessie Nowell) through the window of 1760 Lexington Avenue standing in a circle in the lobby and "shaking their hands, throwing what appeared to be small objects onto the floor and picking up said objects."  See 56.1 ¶¶ 38, 39.  Captain Yakatally had previously witnessed individuals engaged in gambling and believed that Bell,

Nesbitt, Nurse, and Nowell were also engaged in "rolling dice." Id. ¶ 40.   In response, he called for additional officers to investigate, which included Officers Marte and Rodney, as well as plain-clothes officers.   Id. ¶ 41.   Officers Marte and Rodney entered the lobby after Bell, Nesbitt, Nurse, and Nowell had been detained by plain-clothes officers and recognized Bell from the February 10 arrest.   Id. ¶¶ 44-46.   Once again, Bell did not identify the name or apartment number of a resident of the building who had invited him as a guest.   Id. ¶ 47.   Further, following a search of the four individuals, officers recovered dice.   Id. ¶ 48; MSJ Ex. L.[5]

For the same reasons that we have already explained above with respect to the February 10 arrest, probable cause existed to arrest Bell for trespassing.   With regards to the loitering charge, Bell argues that no officer witnessed gambling, and thus there was no probable cause for loitering.   See Opp'n at 10.   However, Captain Yakatally observed the four individuals engaging in behavior that was "consistent with gambling based on his prior experience."   See 56.1 ¶ 40.   "The 'fellow officer' rule provides that an 'arresting officer might not be aware of all the underlying

---

[5]     Additionally, according to Officer Rodney, one of the other men told her that "they were there engaging in a game of chance with dice exchanging money." See MSJ Ex. D at 60:8-19.

facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials.'" Charles v. City of New York, No. 11 Civ. 2783, 2014 WL 1284975, at *6 (S.D.N.Y. Mar. 31, 2014) (quoting U.S. v. Colon, 250 F.3d 130, 135 (2d Cir. 2011)). Therefore, Officers Marte and Rodney need not have personally observed the actions of the four individuals inside of 1760 Lexington Avenue, provided that probable cause was established based on Captain Yakatally's observations.[6]

Given Captain Yakatally's observations of Bell, Nesbitt, Nurse, and Nowell "shaking their hands, throwing what appeared to be small objects on the floor and picking up said objects" in a manner "consistent with gambling," and the recovery of dice following a search, probable cause for loitering was established. See 56.1 ¶¶ 39, 40, 48; People v. Wilder, 834 N.Y.S.2d 92, 92 (N.Y. Sup. Ct. App. Div. 2007) (finding probable cause where an officer observed defendant in the company of two other men engaged in "what appeared to be a dice game" and subsequently recovered dice). Thus, since probable cause existed, all of Bell's federal claims against the individual defendants, other than his excessive force

---

[6]   While the Criminal Complaint incorrectly stated that Officer Rodney had personally observed the alleged gambling activity in the lobby of 1760 Lexington Avenue, see MSJ Ex. I (ECF No. 45-9), this error does not impact our analysis regarding whether probable cause existed.

claim, fail as a matter of law.

### III. Bell Fails to Allege an Excessive Force Claim

Bell's excessive force claim fails as a matter of law.  To begin with, Bell makes no claims that the force used by the officers in either of the two arrests was unreasonable.  See 56.1 ¶¶ 25, 27, 28, 29, 50, 53, 54, 55.  Instead, Bell ties his excessive force claim to his other causes of action, arguing that the two arrests were unlawful and therefore "any touching, including putting handcuffs on Mr. Bell completed the torts of assault and battery."  See Opp'n at 23-24.  Given that we have found probable cause existed for both arrests, this argument fails.  As there are no additional claims of injury, there are no triable issues of fact with regards to this claim.

### IV.  The "Monell" Claim Fails

In order to state a claim for municipal liability under Section 1983, a plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  Torraco v. Port Auth., 615 F.3d 129, 140 (2d Cir. 2010) (internal quotation marks and citation omitted).  Thus, where there is "no underlying constitutional violation . . . [a court need not] address the municipal defendants' liability under Monell."  Segal v. City of New York,

459 F.3d 207, 219 (2d Cir. 2006).

As stated above, Bell has not alleged a constitutional violation. Nor for that matter has he identified a specific policy or custom at issue. To the extent that he relies on his two arrests to allege a Monell violation, these allegations are insufficient to establish a policy or custom. See City of Okla. City v. Tuttle, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). We therefore dismiss Bell's Monell claim.

### V.   State Law Claims

As there are no remaining federal claims, this Court declines to exercise supplemental jurisdiction over any of Bell's state law claims. Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim" where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered

under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."). As such, we do not address the arguments regarding state law claims.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety. The Clerk of the Court is respectfully directed to enter judgment for defendants, terminate the motion pending at ECF No. 44, and close this case.

**SO ORDERED.**

Dated:    New York, New York
          March 16, 2022

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE